## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| **DANIEL WILLIAMS** | ) | **CASE NO.:** _____ |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CLASS ACTION COMPLAINT** |
| **BLUE CROSS BLUE SHIELD OF** | ) | **FOR DAMAGES, AND** |
| **FLORIDA, INC.** | ) | **DEMAND FOR TRIAL BY JURY** |
| | ) | |
| **Defendant.** | ) | |

1. Plaintiff Daniel Williams ("Plaintiff") brings this action on behalf of himself and all others similarly situated, by way of Complaint, against Defendant Blue Cross Blue Shield of Florida, Inc. ( "BCBSF" or "Defendant"), and alleges the following:

### JURISDICTION AND VENUE

2. With respect to Plaintiff's RICO claim, jurisdiction arises under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 (federal question jurisdiction). With respect to Plaintiff's antitrust claim, the Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337. With respect to Plaintiff's Florida statutory claim for nondisclosure of methodology underlying its determinations of "allowed amounts," the Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. §1332(d), as well as supplemental jurisdiction pursuant to 28 U.S.C. §1367.

3. Venue is appropriate in this District for Plaintiff's RICO claim under 28 U.S.C. § 1391, 18 U.S.C. § 1965, and 29 U.S.C. § 1132(e)(2) because (i) BCBSF resides, is found, has an agent, and transacts business in this District and (ii) BCBSF conducts a substantial amount of

business in this district and insures and administers group health plans both inside and outside

this District, including from its principal place of business in Florida.

### BACKGROUND AND PARTIES

4.      Plaintiff Daniel Williams is a resident of Palm Springs, Florida.  Plaintiff was a

covered claimant under a BCBSF "BlueOptions" insurance policy and received treatment from a

licensed healthcare provider of MRI services who is not a participating provider in a BCBSF

preferred provider network (known as a "Nonpar" provider or "out of network" or "OON"

provider).

5.      Defendant Blue Cross Blue Shield of Florida, Inc. ("BCBSF") is a company

headquartered in Jacksonville, Florida.  BCBSF is a managed care company that provides health

insurance and related benefits to insureds through physicians and other providers such as

hospitals.  BCBSF reimburses physicians for services performed on plan enrollees.  As indicated

in the June 24, 2009 U.S. Senate Report entitled "Underpayments to Consumers by the Health

Insurance Industry," BCBSF was a customer of Ingenix, Inc., a wholly-owned subsidiary of

United Healthcare Corporation, another major insurer ("Ingenix").  Additional wrongdoers not

named as Defendants include a) United Healthcare Corporation, b) Ingenix, Inc. c) Aetna; d)

CIGNA; e) Health Net, Inc; f) Oxford Health Plans; and g) the Health Insurance Association of

America ("HIAA").  The additional wrongdoers are identified in the Complaint as the "Co-

Conspirators" and  have participated in the alleged unlawful conspiratorial activity in violation of

federal and state law.

6.      Plaintiffs bring this class action alleging violations of the Sherman Antitrust Act;

RICO; and Florida state law (Fla. Stat. § 627.6044(1)).

2

7.    Plaintiffs' claims arise from BCBSF's undisclosed fraudulent scheme and anticompetitive conspiracy with Ingenix to fix prices that it pays as reimbursements for out of network healthcare services.

8.    Many health insurers, including BCBSF, offer health insurance plans that differentiate between coverage for medical treatment provided by: (i) in-network providers who have negotiated discounted rates with the insurer; and, (ii) out-of-network providers who charge insured consumers their usual, non-discounted rates.  Health insurance plans that permit insured individuals (referred to herein and in the health insurance industry as "subscribers," "members," or "insureds") to seek medical care from out-of-network healthcare providers[1] and be reimbursed for those services are more expensive (i.e., require higher premium payments) than plans that limit members' coverage to care provided by in-network providers.

9.    Members, including Plaintiff, pay higher premiums in exchange for the flexibility and right to obtain out-of-network benefits.  Doctors and other health care providers, including Provider Class members, agree to treat patients who are not insured under a healthcare network with which they affiliate (i.e., who are not in-network patients) based in part on the patient's "assignment" of its healthcare benefits (the out-of-network health insurance services ("ONS") reimbursement) to the provider.

10.    Health insurers, including BCBSF, promise to reimburse for out of network services at a percentage of the lesser of either: (i) the actual amount of their medical bills; or,

---

[1]As used herein, the term "healthcare provider" refers to physicians, physician groups, other healthcare provider and healthcare provider groups, hospitals, clinics, and ambulatory and surgical centers.

(ii) the usual, customary and reasonable rate ("UCR") charged by providers in the same or similar geographic area for the substantially the same service.[2]

11.     However, in order to save money by paying less for OON services, BCBSF improperly utilizes the Ingenix Database to calculate UCR.

12.     BCBSF contracts with Ingenix to: (i) provide out of network claims data and pricing information to Ingenix; and, (ii) receive uniform pricing UCR schedules from Ingenix based on the data they submit.  The uniform pricing schedules provide a price range that purportedly reflects the UCR for the services rendered in the patients' geographic area but which are intentionally less than UCR.  BCBSF and other Insurer Conspirators determine what ONS reimbursement they will pay based on that range.

13.     The out-of-network claims data and pricing information provided to Ingenix by BCBSF and the other insurance companies is rigged to artificially deflate average out-of-network charges.  Ingenix then further manipulates the data to additionally depress the average out-of-network charges to create the purported UCR data set forth on the Ingenix generated schedules ("False UCRs").  When BCBSF and the other insurance companies utilize the False UCRs to calculate ONS reimbursements, the resulting payments to subscribers and providers are artificially low and substantially below the actual UCR for similar services.

14.     As set forth more fully herein, BCBSF's underpayment scheme has been undertaken in connection with its conduct of a RICO enterprise in concert with Ingenix, thereby violating 18 U.S.C. §1962(c) and (d).

---

[2] BCBSF appears to have abandoned the term "UCR" in the material it provides to its insureds.  The change in terminology is not substantive, and BCBSF's wrongful conduct is not impacted by any such change in terminology.

15.     As further detailed herein, the agreement between BCBSF and the other insurance companies to systematically under-reimburse for out of network services through use of the Ingenix Database violates the Sherman Antitrust Act.

16.     BCBSF's actions have resulted in injury to Plaintiffs and Class Members. The subscriber Class Members have not received the benefits that BCBSF agreed and promised to pay.  The provider Class members have likewise been denied benefits BCBSF agreed and promised to pay.

17.     BCBSF's conduct is continuing and will not be remedied absent the relief sought herein by Plaintiffs and Class Members.

## OVERVIEW OF THE INGENIX CONSPIRACY

18.     The selection and purchase of health insurance is of vital importance to consumers.  According to a recent survey by the New York Attorney General ("NYAG"), obtaining affordable healthcare is the number one concern for purchasing consumers.  The conduct of health insurance companies is vitally important to consumers, as well as physicians.

19.     Many health insurers, including BCBSF, offer health insurance plans that differentiate between coverage for medical treatment provided by: (i) in-network providers who have negotiated discounted rates with the insurer; and, (ii) out-of-network providers who charge insured consumers their usual, non-discounted rates.  Health insurance plans that permit subscribers to seek medical care from out-of-network providers, and be reimbursed for those services, are more expensive (i.e., require higher premium payments) than plans that limit members' coverage to care provided by in-network providers, leave the consumer obligated to pay any shortfall in insurer reimbursements to healthcare providers for ONS, and are more

expensive than plans that limit members' coverage to care provided by in-network providers and require higher premium payments.

20.     Plaintiffs' claims in this case are directed at a secret, illegal agreement and deceptive scheme to systemically under-reimburse for ONS.  From at least as early as 1998 to the present (hereinafter, the "Relevant Time Period"), insurers conspired with Ingenix to fix the UCRs used to reimburse for ONS at artificially low levels.  BCBSF participated in this conspiracy.  BCBSF, conspiring with Ingenix, knowingly created a flawed system that uses limited amounts of manipulated data to artificially depress reimbursement rates for ONS.

21.     The instrument used to accomplish this conspiracy is the Prevailing Healthcare Charges System (PHCS) database, and a related platform known as the Medical Data Research (MDR) database – together, these data services platforms are owned and maintained by Ingenix, Inc.   The PHCS and MDR databases are described hereinafter as the "Ingenix Database." BCBSF contracted with Ingenix to (i) provide ONS data claims to Ingenix and (ii) receive uniform pricing UCR schedules from Ingenix based on the data they submit.   The uniform pricing schedules provide a price range that purportedly reflects the UCR for the services rendered in the patients' geographic area.   The Insurer Conspirators then determine what ONS reimbursement they will pay based on that range.

22.     Unbeknownst to Plaintiffs, BCBSF conspired with Ingenix to ensure that the UCR pricing schedules generated by Ingenix are artificially low.  BCBSF then uses those schedules to calculate the Allowed Amounts for ONS reimbursements, the resulting payments to subscribers and providers are artificially low and substantially below the actual UCR for similar services in the relevant geographic area.

23.     Investigations in other states have proven how severely these unlawful practices

impact consumers.  After an extensive investigation of ONS, the NYAG's office concluded that Ingenix under-reported UCRs for doctor visits in New York State by 10%-28%.  The effect of artificially low UCRs on healthcare consumers was then magnified by insurers applying these artificially low UCRs in the ONS reimbursement process.  For example, assume that the actual UCR for a particular ONS is $125 and the insurer has agreed to reimburse 80% of the UCR.  In this scenario, the insurer would reimburse $100 to the provider, and the healthcare consumer would be responsible for the remaining 20%, or $25.  If the UCR is artificially depressed by 10%, then it drops from $125 to $112.50 (the False UCR) and the insurer reimburses 80% of that lower amount, which is $90.  The consumer is then responsible for 100% of the difference between the actual UCR and the False UCR, which in this scenario is $12.50, plus 20% of the False UCR remaining after the insurer calculates its 80% reimbursement, which is $22.50.  This raises the amount the healthcare consumer paid for this particular ONS from $25 to $35.  As a result, an insurer's ability to artificially depress the UCR by 10% on a $125 medical service results is a 40% increase in cost to the health care consumer in this example.  If the UCR is depressed by 28%, the cost to the consumer for this example, ONS rises from $25 to $53, an increase of 112%.

24.     Ingenix serves as the conduit for conspiracies involving health insurers, including BCBSF.  Ingenix contracts with BCBSF to provide UCR claims data.  After Ingenix collects the data from BCBSF and others, it aggregates and manipulates the data, and creates False UCR schedules that are sold to the same health insurers that provided the data in the first place.  BCBSF knew that the Ingenix data collection, aggregation and manipulation process is, and has been, seriously and systemically flawed, and that the result must be artificially low UCR schedules.  By using False UCR schedules, BCBSF was able to under-reimburse the Subscriber

and Provider Plaintiffs and the Classes for ONS.

25. BCBSF participated with Ingenix in hiding this scheme, including the existence and purpose of the Ingenix Database, through a series of material misrepresentations and omissions. BCBSF does not disclose to its insureds that the database used to determine reimbursement rates for ONS is owned and operated as a for-profit business enterprise by one of the country's largest health insurers. There is an inherent and irreconcilable conflict of interest in using a price-setting mechanism (the Ingenix Database) that is based entirely on information provided by insurers, including BCBSF, who have an incentive to artificially deflate the amounts they have to reimburse for ONS. BCBSF's use of the Ingenix Database results in systematic under-reimbursement of charges incurred by their members for ONS.

26. Until recent news reports detailed the NYAG's investigation, the process of setting UCRs used to determine ONS reimbursement was effectively hidden from consumers who purchase and/or participate in health insurance programs and from their health care providers. This lack of transparency was facilitated by the following practices:

- In their healthcare plans, BCBSF affirmatively represented it would accurately reimburse ONS based on various factors, some undisclosed, including UCRs provided by Ingenix;

- BCBSF did not disclose a fundamental conflict of interest, *i.e.*, the Ingenix Database produces UCRs based entirely on an intentionally limited set of unverified data provided by insurers, including BCBSF;

- BCBSF concealed that it regularly and intentionally excluded certain data points representing higher charges before submitting their data to Ingenix, with the

intention and consequence of depressing the resulting Ingenix-provided UCRs and thus enabling BCBSF to under-reimburse for ONS; and,

- BCBSF concealed that Ingenix further manipulates the data it receives from the BCBSF and other insurers to disproportionately remove from its calculations data points that would result in higher reimbursement rates for ONS.

27.     Other health insurance companies, not named as defendants, have participated in the alleged unlawful conspiratorial activity in violation of federal and state law.  Such violations include, among other things, knowingly providing flawed and misleading data to Ingenix for use in developing the Ingenix Database; knowingly acquiescing to flawed and improper manipulation of cost data provided by Ingenix; and, knowingly using False UCRs produced by Ingenix in determining ONS reimbursements.

## OVERVIEW OF PLAINTIFF'S LEGAL CLAIMS

28.     This case arises out of a conspiracy to manipulate the rates by which an insurance company reimburses medical providers for their services, resulting in a substantive disadvantage and an unfair economic burden to consumers and providers of healthcare services.  Specifically, Defendant and its Co-Conspiratorss agreed to create and use flawed data, maintained in the Ingenix Database (defined herein), in order to set reimbursement rates for "out-of-network" services ("ONS") at artificially low levels.  The lower reimbursements to medical providers left Plan Members such as plaintiff in the position of paying more for their out of network health care services than they would have been required to pay absent the conspiracy.  Plaintiff and Class Members who are enrolled in and/or are beneficiaries of BCBSF benefit plans ("Plan Members") were treated by Class Members who are nonparticipating, or "out-of-network," providers ("Nonpars" or "Non-participating" physicians or providers), in that they were not

9

members in BCBSF's physician networks during the Class Period. However, when Plaintiff and other Plan Members sought reimbursement for the bills generated by their treatment with Nonpars for a variety of medical conditions, BCBSF denied coverage for substantial portions of those medical expenses, which should have been, but were not, covered by BCBSF. These underpayments are pervasive and result from systematic operating procedures employed by BCBSF, which affect thousands of Nonpars and their patients every year.

29.     Participating, or in-network providers ("Pars") are physicians who have signed a contract with a particular managed care entity and receive reimbursement of eligible charges directly from that entity. Pars agree to provide healthcare services to plan enrollees at reduced rates in exchange for access to the plan's patient base, among other things. When visiting a Par, Plan Members are only responsible for co-payments, co-insurance, and payment for non-covered items (if any) at the time of service.

30.     By contrast, Nonpar providers do not have a signed contract with a particular managed care entity. Nonpars, therefore, may collect their full charges directly from patients at the time of service, and are not required to accept reduced rates for procedures performed. Rather than require Plan Members to pay out of pocket and in full for medical services, Nonpars may also agree to accept an assignment of benefits, which occurs when a Plan Member authorizes his health benefits plan to remit payment directly to the provider for covered services. Managed care entities may refuse to recognize the patient's assignment and still remit payment to the patient. However, whether or not the health plan honors the assignment and pays the out-of-network benefit amount to the physician, Nonpars are still entitled to bill the patient for the amount of the physician's charge which exceeds the amount the health plan covers.

31.     BCBSF enters into contracts with employers to enable its enrollees to obtain

10

healthcare services at reduced rates.  These contractual arrangements result in the creation of provider networks.  BCBSF defines "In Network Provider" as "any health care Provider who, at the time Covered Services were rendered to you, was under contract with BCBSF to participate in BCBSF's NetworkBlue [defined in turn as "the preferred provider network established and so designated by BCBSF which is available to BlueOptions members under this Benefit Booklet…"] and included in the panel of providers designated by BCBSF as 'In-Network' for your specific plan." Like typical PPO insurance, BCBSF's plan differentiates between: (1) coverage for medical treatment from "in-network" providers who have negotiated discount rates with the insurer; and, (2) coverage for treatment from out-of-network providers who charge insureds their usual, non-discounted rates.

32.     With respect to "Out of Network Providers," the BlueOptions Plan Booklet provides:  "When you use Out of Network Providers your out-of-pocket expenses for Covered Services will be higher…." With respect to "In-Network Providers," the Booklet instructs that, "[w]he you use In-Network Providers, your out-of-pocket expenses for Covered Services will be lower."     Similarly, BCBSF's Website-based information regarding their PPO network arrangements states: "When members access NetworkBlue providers, covered benefits are reimbursed at a higher benefit level and their coinsurance percentage is usually lower." (Source: http://www.bcbsfl.com/DocumentLibrary/Providers/Content/ManualForPhysProv_Sect3.pdf, last viewed on October 28, 2009)

33.     Generally, health insurance plans, as part of their agreements with in-network providers, preclude the provider from billing the patient for any amount billed by the provider above the agreed upon rate for in-network services.  Thus, in-network medical providers are contractually precluded from "balance billing" patients. By definition, out-of-network providers

do not have agreed upon rates with the insurance company and are not contractually precluded from balance billing. Thus, whatever the insurance company does not pay can usually be is billed by out-of-network providers to the Plan Member

34.     Under Plaintiff's plan, BCBSF Members have an express right to receive treatment from providers who have not entered into contracts with BCBSF as to the fees they will accept. These are known as nonparticipating ("Nonpar") providers. If the services are rendered by a nonparticipating provider, BCBSF makes the payment to the member. The BCBSF Website-based information provides: "The preferred provider network for our BlueOptions plans is NetworkBlue. BlueOptions members may seek care from providers in their network (NetworkBlue), Traditional/PPS/PHS network providers or other nonnetwork providers … [f]or services performed by a nonparticipating provider, BCBSF will make the payment to the member."

(http://www.bcbsfl.com/DocumentLibrary/Providers/Content/ManualForPhysProv_Sect3.pdf.

35.     When BCBSF Members receive Nonpar services, BCBSF's payment is based on the lesser of the billed charge or the "an amount established by BCBSF based on several factors." ("Allowed Amount") BCBSF calculates benefits for Nonpar services based on these "factors".

36.     BCBSF applies uniform policies for calculating Allowed Amount.

37.     Plaintiff's BCBSF Benefit Plan Booklet defines "Allowed Amount" as "the maximum amount upon which payment will be based for Covered Services." The Booklet explains:

> 1.     In the case of an In-Network Provider located in Florida, this amount will be established in accordance with the applicable agreement between that Provider and BCBSF.
>
>                                         ****

5.      In the case of Out-of-Network Providers that have not entered into any agreement with BCBSF, ...the Allowed Amount will be the lesser of the Provider's actual charge or an amount established by BCBSF based on several factors including (but not necessarily limited to): BCBSF's medical, payment, and/or administrative guidelines; diagnostic related grouping(s) (DRG); payment for such services under the Medicare program; relative value scales; the charge(s) of the Provider; the charge(s) of similar Providers within a particular geographic area established by BCBSF; and/or cost of providing the Covered Service.

If a particular Covered Service is not available from any provider that is in Network Blue, as determined by us, the Allowed Amount, whenever Florida Statute 627.6471 applies, means the usual and customary charge(s) of similar Providers in a geographic area established by us.

38.      The reference to "several factors including (but not necessarily limited to)" demonstrates that BCBSF is not making a reasonable and unbiased determination of the actual "charge(s) of similar Providers within a particular geographic area" but is adding other factors, some undisclosed, including the use of the Ingenix database, in calculating the Allowed Amount.

39.      By failing to specify the criteria used in making the Allowed Amount determination, BCBSF has left its contract ambiguous, and any such ambiguity is to be construed against BCBSF and in favor of Plaintiff and the Class.

40.      BCBSF explains on its website: "The 'Allowed Amount' is the amount we have negotiated with providers for payment of covered services, instead of a member paying the full charge for a service." In other words, the "Allowed Amount" determination on a medical bill can only be made if the provider is a participating provider, not a Non-Participating Provider.

41.      BCBSF makes clear in its "Benefits Summary" ("Summary"),[3] that the Member is financially responsible for the difference between the Allowed Amount and the provider's billed charge for Nonpar services. For example, Plaintiff's BlueOptions Plan Booklet provides, inter alia:

---

[3] Otherwise referred to as "Explanation of Benefits," "EOB," or similarly designated statements.

|  | In-Network | Out-of-Network |
|---|---|---|
| **Can you be billed the difference between what we pay the Provider and the Provider's charge?** | • **NO**. You are protected from being billed for the difference in our Allowed Amount and the Provider's charge when you use In-Network Providers. The Provider will accept our Allowed Amount as payment in full for Covered Services except as otherwise permitted under the terms of the Provider's contract and this Booklet. | • **YES**. You are responsible for paying the difference between what we pay and the Provider's charge…<br><br>• |

42.     Billed amounts that are greater than the "Allowed Amounts" BCBSF pays are not credited toward its Members' annual deductible for Nonpar services, nor toward the annual out-of-pocket maximum.

43.     In-network or contracted or participating ("Par") providers enter into contracts with BCBSF to accept reduced or discounted fees for their services. When a Member uses a Par provider, his or her financial responsibility is limited to a specified co-payment, typically in the range of $10 to $30 per service.

44.     As defined in Plaintiff's BCBSF plan booklet, an out-of-network provider is one who has no contract with a BCBSF health plan. (See supra.) When a BCBSF Member uses a Nonpar provider, BCBSF imposes additional costs on the Member in the form of higher deductibles and coinsurance, and benefit and lifetime maximums. BCBSF does not begin to pay for Nonpar services until the BCBSF Member has satisfied the calendar year deductible. Once a Member satisfies the deductible, then BCBSF will pay a share (typically 80%) of the allowed amount for Nonpar Services. If and when a Member reaches a maximum amount of out-of-pocket expenses for Nonpar services, typically in the range of $1,500 - $3,000, the Member has

14

no further coinsurance obligation (e.g., 20% of the allowed amount) for any additional Nonpar services for that calendar year. BCBSF does not credit amounts above the Allowed Amount to the Member's deductible or out-of-pocket maximum.

45.     The Plan Booklet provides that, if an enrollee's Schedule of Benefits and BlueOptions Provider directory do not include a provider as In-Network under the enrollee's benefit plan, the provider is deemed Out-of-Network. BCBSF pays the Allowed Amount for the service that was rendered by the Par provider, as if it were rendered by a Nonpar provider, and the Member is responsible for any unpaid amounts above the Allowed Amount.

46.     BCBSF is obligated to pay an Allowed Amount to its Members for Nonpar services that accurately reflects UCR.

47.     BCBSF fails to comply with applicable law by failing to pay benefits based on accurate UCR rates to its Members for Nonpar services (whether by Nonpar providers or by Par providers considered Nonpar by BCBSF), and instead applying an unlawfully and inaccurately calculated Allowed Amount.

48.     To determine the Allowed Amount, BCBSF primarily relies on a computer database of provider charge data obtained from Ingenix.

49.     In addition to the Allowed Amount determinations based on the Ingenix Databases, this Class Action Complaint challenges other Nonpar benefit reductions, including those imposed by use of the following methods:  use of discounted amounts or Par provider fee schedules; use of Medicare data; use of the average wholesale price ("AWP") to determine Allowed Amount for pharmaceutical drugs; failing to pay appropriately for emergency room ("ER") services; failing to properly credit deductible amounts and out-of-pocket maximums; failing to provide an appropriate appeals process mechanism; approving requests for

preauthorization without disclosing its nonpayment of a large percentage of the billed charges; threatening to refer members and Nonpar providers to collection agencies based on baseless allegations of overpayment by BCBSF; and, other improper practices (collectively, along with Allowed Amount, "Nonpar Benefit Reductions").

50.     Nonpar Benefit Reductions leave BCBSF Members financially responsible for unpaid amounts and act as exclusions from coverage. As the entity excluding benefits through its Nonpar Benefit Reductions, BCBSF has the burden to demonstrate that its exclusions comply with its legal obligations. This Complaint alleges that BCBSF cannot sustain its burden regarding its Nonpar Benefit Reductions, and seeks recovery of unpaid benefits and other relief for Plaintiffs and all others similarly situated.

51.     Plaintiff, on behalf of himself and all similarly situated Class Members who are recipients of medical services from Nonpar providers and the Nonpars themselves, avers that BCBSF's Nonpar Benefit Reductions violate RICO. Plaintiffs' Class claims, including the respective "Class Periods," are defined below.

52.     With respect to all its health care plans, BCBSF is obligated to Nonpar providers to provide unreduced reimbursements in the proper and correct amounts. As detailed herein, BCBSF has breached, and continues to breach, its obligations to Plaintiff and the Class, and in so doing has violated RICO.

## PLAINTIFF'S BCBSF GROUP HEALTH PLAN

53.     Plaintiff Daniel Williams is an enrollee in BCBSF's provider network who was treated by a provider that, as an out-of-network provider, has not agreed to accept any discounted rates from BCBSF for the services it provides, and it is entitled to the reimbursement of his provider's usual, customary and reasonable charges for the healthcare services rendered. For his

treatment, Plaintiff's Nonpar provider billed $1,210. Under his BCBSF benefit plan, Plaintiff was entitled to the reimbursement of 80% of that amount after his deductible had been satisfied.

54.     Plaintiff Williams's experience with BCBSF's unlawful business practices is typical of what has happened to the Class as a whole. Other BCBSF enrollees received treatment from Nonpar providers, and the medical bills generated by that treatment have repeatedly been subjected to reductions in reimbursements based on BCBSF's representations that the bills are in excess of the Allowed Amounts. As a result, the Nonpars' patients enrolled in BCBSF – including Plaintiff Williams – have sustained a greater share of out-of-pocket expenses. In so doing, BCBSF has relied improperly on the flawed and inadequate Ingenix database, which fails to identify legitimate Allowed Amounts.

55.     Plaintiff alleges, as detailed herein, that BCBSF relied on flawed and inappropriate data for determining the Allowed Amounts for Non-Par benefits as a result of its use of the Ingenix database. By relying on such improper data for making Allowed Amount determinations, BCBSF breached its duties and, as a result, it should be required to reimburse the Non-Par provider charges of BCBSF enrollees who received reduced payments on their medical claims.

56.     Following each treatment by a Nonpar provider, Plaintiff and each Class Member submitted to BCBSF a valid claim in compliance with the terms of their health care plan, seeking payment of benefits as required under the BCBSF contract.

57.     Following the submittal of his $1,210 claim, Plaintiff received a Benefit Summary from BCBSF concerning these health care services. In the Summary, BCBSF reported that it had "Allowed" only the amount of $419.70, which it applied to Plaintiff's deductible, resulting in $0 net payment.

58.     The amounts other than the "Allowed Amount" were unpaid due to BCBSF's improper Nonpar Benefit Reductions as detailed herein.  Plaintiff was actually damaged by having his $6,000 deductible reduced by a smaller amount than would have resulted from a legitimate Allowed Amount determination.

59.     During the Class Period, BCBSF failed to properly calculate deductibles, coinsurance and out-of-pocket maximums in violation of Plaintiff Williams' BCBSF health care plan, as described in the Summary.  By failing to properly calculate these amounts, BCBSF subsequently underpaid Plaintiff and other Plan Members and their Nonpar providers for the healthcare services rendered to the former by the latter.

60.     BCBSF's Benefit Summaries reflecting Nonpar Benefit Reductions did not adequately disclose either the basis or the underlying reasons for the Nonpar Benefit Reductions. BCBSF did not disclose whether it used a particular database, Medicare rates, or some other methodology, BCBSF did not provide the specific reasons regarding Nonpar Benefit Reductions.

61.     BCBSF is legally obligated to adhere to the specific provisions of its Members' group health plans.

62.     The Benefit Summaries and EOBs sent by BCBSF regarding its Nonpar Benefit Reductions during the Class Period did not comply with legal requirements, including federal claims procedure regulations.  The Summaries and EOBs failed to advise BCBSF Members and their providers of the specific reasons for the denial, the specific plan provisions, and their appeal rights. BCBSF's Summaries and EOBs reflecting Allowed Amount determinations failed to advise Plaintiff of the data BCBSF used to calculate Allowed Amounts.  Examples of BCBSF's omissions of required disclosure on Summaries and EOBs include the following:

- Absent or inadequate "Remarks" or "Notes" describing BCBSF's benefit reductions and failure to provide the required "specific" reasons for the disallowed amounts above the Allowed Amount.

- The particular fee schedule or data or methodology used to determine the Allowed Amount.

- The characteristics (resulting in the invalidity) of the Ingenix Databases used to determine the Allowed Amount.

- The disclaimer that accompanies Ingenix data.

- BCBSF's manipulations of the data contributed to the Ingenix. Database, and Ingenix's manipulations of the data from all contributors.

- BCBSF's use of certain Medicare rates that reduced benefits and left its Members financially exposed.

63.     Disclosure of the precise methodology underlying an insurer's Allowed Amount determination is a positive requirement under Florida state law.   See F.S.A. §627.6044(1) (2009).[4]   The Plan Booklet refers to "several factors" which it says will be evaluated in determining the "Allowed Amount," including some undisclosed factors (see supra).   However, the only criterion BCBSF used is the flawed fee schedule provided by Ingenix, resulting in improper "Allowed Amount" determinations and hence causing Nonpars to go underpaid and Plan Members to shoulder more than their fair share of the medical expense.

## BCBSF'S RICO PREDICATE ACTS

---

[4] "Each insurance policy that provides for payment of claims based on a specific methodology, including, but not limited to, usual and customary charges, reasonable and customary charges, or charges based upon the prevailing rate in the community, shall specify the formula or criteria used by the insurer in determining the amount to be paid."   West's F.S.A. § 627.6044(1).

64.    During the RICO Class Period, BCBSF engaged in a series of predicate acts underlying its RICO violations. These predicate acts include the dissemination through the U.S. Mail of numerous fraudulent, misleading and deceptive Benefit Summaries, EOBs, and other communications to Class Members, and by transmitting through the internet fraudulent, misleading and deceptive representations on its public website, as detailed in this Complaint.

65.    BCBSF disseminated through the U.S. Mail Benefit Summaries and EOBs misrepresenting that BCBSF's reduction of the allowed amount below the billed charge was because the billed charge was greater than the "Allowed Amount," i.e., exceeded the "the maximum amount upon which payment will be based for Covered Services," meaning, the BCFSF-determined UCR amount. BCBSF made similar communications via mail to Class Members.

66.    BCBSF's representations to Class Members were knowingly false and misleading. BCBSF knew and recklessly disregarded that its method for determining Allowed Amounts for Nonpar providers was fatally flawed and did not properly determine valid UCR levels, and that it did not have a valid basis upon which to represent that the providers' bills were greater than the usual and customary charge for the relevant services in a particular geographic area.

67.    In determining Allowed Amounts, BCBSF relied primarily on the Ingenix Databases and, from time to time, used Medicare rates. Neither methodology is a proper basis for UCR determinations. With regard to the Ingenix Databases, BCBSF, upon information and belief, knowingly submitted data to Ingenix that BCBSF had improperly pre-edited to remove high charges, thereby artificially lowering the reported charges that were used to set the UCR. The Ingenix Databases are flawed for numerous other reasons, as detailed in this Complaint.

20

Similarly, Medicare rates are not designed to and do not, establish the UCR, and cannot legitimately be used for that purpose.

68.     Regardless of whether the data BCBSF relied upon from the Ingenix Databases were based upon actual or derived charges, they do not fall within the description provided by BCBSF in its various EOBs. Because of the manipulation of the data by BCBSF and Ingenix, as well as (among other reasons) the inclusion of data from all health care providers, regardless of licensure or experience, and the omission of modifiers, the number based on actual data nevertheless failed to reflect the prevailing or customary charges.   For derived data, which represents the vast majority of CPT Codes in PHCS and all of the charges in MDR, the numbers reported by Ingenix have no relation to actual billed charges, whether prevailing or otherwise. Thus, during the Class Period, BCBSF defrauded its members through its false and misleading EOBs.

69.     As a further aspect of its scheme to reduce Nonpar benefits below the level it was otherwise contractually required to pay, using the U.S. Mail and/or interstate wire facilities, BCBSF, upon information and belief, submitted fraudulent certifications to Ingenix concerning its data.  In particular, Ingenix requires its Data Contributors (including, upon information and belief, BCBSF) to attest or certify that the data being submitted for inclusion in the Ingenix Databases reflected all of the available data from the contributor, without being pre-edited or otherwise manipulated.   Upon information and belief, BCBSF was one of Ingenix Data Contributors, and falsely made the above attestation or certification, even though it precluded substantial data from being included in its submission to Ingenix.  The impact of BCBSF's manipulation of the data that BCBS, upon information and belief, submitted to Ingenix for inclusion in the Ingenix Databases was to lower the amount of the reported charges so as to

reduce the ultimate numbers that Ingenix would report and which BCBSF would use for making its Allowed Amount determinations. All of this material information was withheld from Plaintiff and Class Members.

70.    The EOBs sent by BCBSF to Plaintiff via U.S. Mail and reflecting Allowed Amount benefit reductions did not adequately disclose the basis for, nor the reasons behind, the exclusion of expenses, and thereby precluded Plaintiffs from the information they needed to challenge BCBSF's Allowed Amount determinations. BCBSF did not disclose whether it used a particular database, or Medicare rates, or some other methodology, and it did not disclose the required information about how Plaintiffs and Class Members might successfully appeal the Allowed Amount benefit reductions. Among other things, such nondisclosure violated F.S.A. §627.6044(1).

71.    Upon information and belief, BCBSF's Internet website was also fraudulent and misleading. The website represented to BCBSF's Members, via the Internet (which utilizes interstate wire facilities), that BCBSF made its Allowed Amount determinations based on the prevailing charges of what other providers charged for similar services in specific areas.

72.    These statements, as disseminated to Plaintiffs and Class Members via BCBSF's Internet website, were false.

73.    In fact, the Ingenix Databases use derived data for the vast majority of CPT Codes, such that when there are less than nine charges reported in a particular geographic area prevailing charges from other areas are not used, as Ingenix falsely represents.

74.    Further, even if there are more than eight charges contained in the Ingenix PHCS Database, and they are used to provide a dollar amount for a CPT code at a given percentile, the eight or more charges could all come from one provider, or a few providers of different

licensure, specialties, training and experience performed at different places of service for patients of different ages, gender and disparate health conditions.

75.     All of these factors affect the reasonableness of the billed charge. None of these factors are accounted for in the Ingenix Databases. BCBSF has no way of knowing the number of providers who submitted data, or a way to differentiate between them, so that BCBSF is unable to satisfy its representation on its website of checking the actual charges from other areas when there were only a small number of instances that a certain service was provided in an area.

76.     In addition, even when actual charge data was reported by Ingenix in the Ingenix PHCS Database, BCBSF had no basis for concluding that these data reflected actual prevailing charges for the reasons cited above and in light of the manipulation of data by Ingenix as well as the improper pre-editing of submitted data by BCBSF itself.

<h3 align="center">SUMMARY OF THE ANTITRUST CLAIM</h3>

77.     The antitrust claim concerns a conspiracy between BCBSF, Ingenix and the largest health insurers in America to use the Ingenix database to depress reimbursements for out of network services to Plan Members. This conspiracy used the tremendous collective market power of Ingenix and the insurance companies that contribute data to Ingenix. This conspiracy has fixed the prices for such reimbursements and resulted in significant financial damage to the members of the class.

78.     Other health insurance companies, not named as defendants, have participated in the alleged unlawful conspiratorial activity in violation of federal and state law. Such violations include, inter alia, knowingly providing flawed and misleading data to Ingenix for use in determining UCR rates; knowingly acquiescing to flawed and improper manipulation of data provided by Ingenix; and knowingly using artificially low UCR rates produced by Ingenix in

23

determining Allowed Amounts for ONS.

## RELEVANT PRODUCT MARKET

79.     The relevant product market is the market for data services used to calculate UCR rates for claims from patients for out-of-network, non-negotiated medical services.

80.     The relevant geographic market is the United States which itself is subdivided by Ingenix, BCBSF and their Co-Conspiratorss by, inter alia, Geozips which are used as coordinates for setting the ultimate reimbursement rates.

81.     Ingenix, BCBSF and their Co-Conspiratorss jointly produce this service. Ingenix compiles and administers the Ingenix Database while BCBSF and the Co-Conspiratorss provide the raw data necessary for the Ingenix Database, as the benchmark for UCR rates setting reimbursement for ONS.

82.     Today, the vast majority of health insurers have agreed to use the Ingenix Database to determine UCR rates for reimbursing out-of-network claims. Indeed, Ingenix promotes its database as the "industry standard" for determining UCR rates in order to provide their artificially low reimbursements for ONS with the appearance of legitimacy and accuracy.

## THE RELEVANT PRODUCT MARKET IS CONDUCIVE TO COLLUSION

83.     The market for the provision of data services used to calculate UCR rates for claims from patients for out-of-network, non-negotiated medical services is conducive to the collusion alleged herein. The market has high barriers to entry. The high barriers to entry include: (1) the costs of obtaining historical and current insurers' data; (2) the costs of constructing, developing, and maintaining hardware and software platforms necessary to aggregate, manipulate, and disseminate the data; and, (3) the costs of successfully marketing insurers to adopt the services.  Indeed, obtaining historical data forces any new entrant into an

agreement with Ingenix who controls the relevant historical data.

84.     The market for the provision of data services used to calculate UCR rates for claims from patients for out-of-network, non-negotiated medical services is a mature market having been in existence for decades. There are few competitors and the market has been marked by consolidation among the competitors, such that Ingenix now provides the vast majority of services in this market.

85.     BCBSF and its Co-Conspiratorss have ample opportunities to communicate amongst themselves concerning the conspiracy alleged herein, including the collection and dissemination of data used to establish the UCR rates for calculating reimbursement for ONS.

86.     Indeed, BCBSF and its Co-Conspiratorss are in almost constant communication with Ingenix under the terms of the licensing agreements that govern the use of the Ingenix Database.

87.     It is in BCBSF's and its Co-Conspiratorss self-interests to conspire to provide inaccurate low reimbursement rates to Ingenix for use in its database.  It is contrary to their individual and collective best interests to provide accurate reimbursement rates because each of the Co-Conspiratorss uses the Ingenix database for the calculation of reimbursement of out-of-network services.   If any Co-Conspirators provides accurate information, that accurate information would raise the reimbursement rates not only for themselves, but for all of the Co-Conspiratorss, thus raising the costs and reducing profits for all.

88.     There is no competition among BCBSF or its Co-Conspiratorss with respect to the reimbursement of out-of-network medical services.   Generally, health insurance plans are selected by members' employers based upon premiums and other out-of-pocket costs and in-network providers, not the reimbursement paid for individual services provided by out-of-

network providers.   Neither members of a BCBSF health plan, nor out-of-network service providers have any reasonable alternative but to accept whatever out-of-network reimbursement is offered by BCBSF and its Co-Conspiratorss.   Further, out-of-network providers have no alternative but to seek reimbursement from whatever health plan their patient is enrolled in. They cannot shop competitively for reimbursement from the health plan which pays the highest reimbursement.

### DEFENDANTS' CONDUCT: ANTICOMPETITIVE, UNFAIR AND DECEPTIVE

89.     Ingenix is one of the largest health data and technology companies in the United States with annual sales of $1.3 billion and a customer base of more than 1,500 insurance companies. Eighty percent of health plans in the country are Ingenix clients. Ingenix's growth has been fueled by the acquisitions of over 50 companies since its founding by UnitedHealth in 1996. Ingenix's operating margins are about 20 percent compared with about 10 percent for United Health as a whole.

90.     Ingenix exercises market power for the provision of data services used to calculate UCR rates for claims from patients for out-of-network, non-negotiated medical services. Ingenix is the dominant provider of data, including the provision of UCR rates, to health insurers in the United States for use in billing. Ingenix boasts of a "health care information database twice the size of the Library of Congress" and of "offer[ing] the most comprehensive set of data, technology and analytic capabilities" in the industry.  Most health insurers use data provided by Ingenix, including the largest health insurers in the United States, such as United Health and BCBSF. Ingenix enters into agreements with health insurers, including BCBSF, to (1) obtain data, such as billing rates and information, from the health insurers in order to construct its database; and/or (2) provide data, such as UCR rates, to health insurers, including BCBSF, for

their use in billing ONS. Ingenix offers the Ingenix Database to health insurers at a discounted rate, if health insurers agree to provide Ingenix the necessary information for its database.

91.     In 1997, Ingenix greatly expanded the Ingenix Database by acquiring several of its competitors. For example, in late 1997, Ingenix acquired Medicode, Inc. which sold its "MDR Price Management" ("MDR") database of UCR rates to health care professionals for pricing benchmarks for medical services. In October 1998, Ingenix purchased the Prevailing Healthcare Charges System ("PHCS") from HIAA. PHCS was also a comprehensive database of provider charges, including UCR rates, for private health care services and contained the largest pool of charges for medical services. As part of the PHCS acquisition, Ingenix and HIAA entered into a ten-year cooperation agreement. The agreement placed controls on Ingenix's use (See http://www.unitedhealthgroup.com/careers/bus/bus_ingenix.htm  (last visited October 24, 2008) and pricing of the PHCS database as it concerned HIAA members and provided that HIAA members with continued input into the PHCS database, particularly its data.

92.     Through its MDR and PHCS acquisitions, Ingenix effectively eliminated competition from the market for data services used to calculate UCR rates for claims from insureds for out-of-network, non-negotiated medical services. Indeed, the President of HIAA stated that HIAA opted to sell PHCS to Ingenix because HIAA "didn't think [HIAA] could compete." None of Ingenix's Co-Conspiratorss opted to set up a competing database after the sales of MDR and PHCS to Ingenix, despite the fact that Ingenix was wholly-owned by a horizontal competitor, United Health.

93.     To create the Ingenix Database, Ingenix collects and compiles billed charge data contributed by health insurers who are horizontal competitors, including, upon information and belief, BCBSF as well as United Health and others. Thus, the discretion for determining UCR

rates was, by the end of 1998, in the hands of Ingenix. This concentration facilitated the industry-wide collection of claims data from United Health, BCBSF and their Co-Conspiratorss into Ingenix and further facilitated the dissemination of artificially low UCR rates used in ONS reimbursements. Upon information and belief, BCBSF and United Health, as well as their Co-Conspiratorss, are Ingenix Data Contributors.

94.    Upon information and belief, BCBSF has contributed a substantial number of charges to the Ingenix Database during the Class Period.

## CLASS DEFINITIONS

95.    Plaintiff brings this action on her behalf and on behalf of a Class defined as:

All claimants covered under a BCBSF insured or administered health plan and all non-participating medical providers, who at any time during the period of January 1, 2005 through the present, were provided benefits or paid less than the billed amount for medical services on the basis that those charges were for "out of network" medical services.

## COMMON QUESTIONS PREDOMINATE

96.    Plaintiff's allegations give rise to common questions that predominate in this class action, including, without limitation:

- Whether BCBSF's use of the Ingenix Databases to calculate Allowed Amount in determining reimbursement for services of Nonpar providers breached BCBSF's legal obligations to its Members in group health plans;

- Whether BCBSF's EOBs (and/or other communications) violated applicable law;

- Whether BCBSF engaged in a pattern of racketeering activity, as defined by RICO, by and through the conduct of the BCBSF-Ingenix Enterprise described in this Complaint; and

- Whether BCBSF and its coconspirators violated the antitrust laws by fixing the prices or influencing the fixing of the prices at which ONS reimbursement would be calculated.

## ADDITIONAL CLASS ACTION ALLEGATIONS

97.     Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, the Class consists of tens of thousands of BCBSF Plan Members treated by Nonpar providers and the Nonpar providers themselves.   The precise number of members in the Class is within BCBSF's custody and control.   Based on reasonable estimates, the numerosity requirement of F.R.C.P. Rule 23 is easily satisfied for the Class.   For example, these are tens of thousands BCBSF Members in Florida alone.   Nationwide, these are millions of BCBSF Members subject to the allegations of this Complaint.

98.     Common questions of law and fact exist as to all Class Members and predominate over any questions affecting solely individual members of the Class, including the class action claims, issues and defenses listed above.

99.     Plaintiff's claim is typical of the claims of the Class Members because, as a result of the conduct alleged herein, BCBSF has breached its statutory obligations to Plaintiff and Class by engaging in the uniform practices, described above.

100.    Plaintiff will fairly and adequately protect the interests of the members of the Class, and is committed to the vigorous prosecution of this action, has retained counsel competent and experienced in class action litigation and has no interests antagonistic to or in conflict with those of the Class.   For these reasons, the named Plaintiff is an adequate class representative.

101.    The prosecution of separate actions by individual members of the Class would

create a risk of inconsistent or varying adjudications, which could establish incompatible standards of conduct for BCBSF.

102.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. Further, because the unpaid benefits denied Class Members may be relatively small, the expense and burden of individual litigation make it impossible for the Class Members individually to redress the harm done to them.  BCBSF maintains computerized claims information that enables it to calculate unpaid amounts resulting from Nonpar Benefit Reductions for Class Members. Given the uniform policy and practices at issue, these will also be no difficulty in the management of this litigation as a class action.

**COUNT I**

**<u>VIOLATIONS OF RICO</u>**

103.     Plaintiff repeats the allegations contained in the prior paragraphs of the Complaint as if fully set forth herein.

104.     At all relevant times, BCBSF was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

105.     At all relevant times, and as described in this Complaint, BCBSF carried out its underpayment scheme to BCBSF Members and their Nonpar providers in connection with the conduct of an association-in-fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), comprised of BCBSF and Ingenix (the "BCBSF-Ingenix Enterprise" or the "Enterprise").

106.     At all relevant times, the BCBSF-Ingenix Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

107.     As described herein of this Complaint, the BCBSF-Ingenix Enterprise has and

30

continues to have an ascertainable structure and function separate and apart from the pattern of racketeering activity in which BCBSF has engaged.

108.    In addition, the members of the BCBSF-Ingenix Enterprise function as a structured and continuous unit, and performed roles consistent with this structure.  The members of the BCBSF-Ingenix Enterprise performed certain legitimate and lawful activities that are not being challenged in this Complaint, including the provision of health insurance and plan and claims administration services by BCBSF, which was done for many claims lawfully and without resort to unlawful practices.

109.    However, the collection and dissemination of health insurance information by Ingenix was not legitimate when it involved the creation, use and dissemination of invalid data for use in making UCR determinations. Aside from legitimate activities carried out by the members of the BCBSF-Ingenix Enterprise, its members used the Enterprise's structure to carry out the fraudulent and unlawful activities alleged in this Complaint including, but not limited to, intentional underpayment of BCBSF Members resulting from the use of flawed and invalid data for its UCR determinations.

110.    The purpose of the BCBSF-Ingenix Enterprise was to create a mechanism by which BCBSF could reduce benefit payments for Nonpar services through use of flawed and invalid data, but to do so through a means that subscribers would be unable to challenge effectively.

111.    In particular, as described herein, the BCBSF-Ingenix Enterprise created what appeared to be an appropriate and unassailable database which reported actual charge data; the Ingenix Databases were designed to appear valid as a basis for UCR when, in fact, they were invalid. The BCBSF-Ingenix Enterprise operated as an underpayment scheme – undertaken with

the common purpose of reducing the price paid for ONS, and increasing the profits of the Enterprise participants and the Co-Conspirators.

112.    Through their roles in the BCBSF-Ingenix Enterprise, Ingenix benefited indirectly through the monies saved by United Healthcare, its parent corporation, and by enhancing its ability to earn licensing fees through the sale of the Ingenix databases, while BCBSF benefited by reducing the amount of benefits it paid for Nonpar services through the use of the Ingenix Databases to price UCR.  Ingenix also used data submitted by Data Contributors to create other products, the licensing and sale of which directly benefited Ingenix.

113.    As alleged herein, although Ingenix issues a disclaimer to the users of the Ingenix Databases, including BCBSF, BCBSF continued to use the Ingenix Databases in a manner directly at odds with the disclaimer, while Ingenix knew that its BCBSF was using the Ingenix Databases improperly to make Allowed Amount determinations.

114.    At the same time it was issuing a disclaimer in an effort to provide itself with legal protection, Ingenix was also promoting Ingenix Databases as a cost-savings mechanism that could save substantial sums to those who used them in making UCR determinations.  Thus, BCBSF and Ingenix expressly observed the disclaimer in the breach despite the fact that the disclaimer was correct in reporting that the Ingenix Databases could not be used as a basis for making UCR determinations.

115.    Similarly, as alleged herein, while Ingenix required certifications from the Data Contributors, including BCBSF, that purportedly verified that they were submitting all available data and were not pre-editing or otherwise manipulating the data prior to its contribution, Ingenix knew full well that these certifications were invalid because users of the Ingenix Databases, including BCBSF, were not submitting all of their data and were pre-editing and manipulating

the data prior to its submissions in furtherance of Ingenix's effort to understate UCR amounts.

116.    The pre-editing and incomplete submission of data to Ingenix benefited Ingenix, and users of the Ingenix Databases, including United Health Care, Ingenix's parent company, and BCBSF.  Ingenix also failed to conduct any audits or reviews of its data to ensure that the data were valid and appropriate.

117.    Ingenix and BCBSF knew that the Ingenix Databases were being used without BCBSF Members, or other health Plan Members, and their Nonpar providers ever being informed of the disclaimer or the inherent flaws in the Ingenix Databases.

118.    For example, upon information and belief, BCBSF falsely reported to Class Members that its reductions were based on UCR when, in fact, the reductions were based on flawed and invalid Ingenix Databases that substantially underreported UCR.  BCBSF referred overpayment recovery actions to collection agencies based on the flawed Ingenix data.  At the same time, BCBSF ensured that lawfully required information concerning Nonpar Benefit Reductions was not disseminated to BCBSF Members, in violation of BCBSF members' benefit plans and federal law.

119.    BCBSF participated in the BCBSF-Ingenix Enterprise in order to shift the costs of medical treatment provided by Nonpar providers from BCBSF to its Members, to reduce BCBSF's UCR payments and to create an appearance of legitimacy for its Nonpar Benefit Reductions.  BCBSF provided false and incomplete information to BCBSF members to convert those withheld funds for the BCBSF-Ingenix Enterprise's own direct and indirect financial gain, and to discourage its Members from using Nonpar providers.

120.    Because BCBSF saves money when Par providers render services, the BCBSF-Ingenix Enterprise saved BCBSF money at the expense of BCBSF Members and their Nonpar

providers. In turn, the Enterprise benefited from the pattern of racketeering activity through the reduction of UCR costs by BCBSF and other users of the Ingenix Databases, which would not have been obtained absent entry into the Enterprise and was, in addition to the conduct of BCBSF alleged above, the shared goal of the Enterprise for which its members functioned as a continuous unit.

121. BCBSF further used the Enterprise to facilitate its goal of reducing Nonpar benefits by submitting pre-edited and manipulated data to Ingenix, thereby artificially reducing the numbers that would be reported in the final Ingenix Databases and which BCBSF relied upon to make UCR determinations.

122. Upon information and belief, as part of this fraudulent scheme, as alleged herein, BCBSF submitted false certifications to Ingenix which attested that it was submitting all of its data, when it was not. Upon information and belief, neither Ingenix nor its parent company, United Healthcare, took steps to audit or otherwise validate the data that Ingenix was receiving from BCBSF and other data contributors. Ingenix was aware of the manipulation of data by Data Contributors (including, upon information and belief, BCBSF), but allowed it to occur, since it was consistent with Ingenix's goal to underreport UCR. If BCBSF had not entered into the BCBSF-Ingenix Enterprise by submitting pre-edited and manipulated data to Ingenix, it would not have been able to obtain the benefits it did from the Enterprise. Ingenix needed sufficient data to allow it to represent to its customers that the Ingenix Databases were the largest available and had sufficient numbers to remove any doubt as to their validity. Ingenix also needed data that reported sufficiently low charges so that it could represent to its users that the Ingenix Databases would save users money used to make UCR determinations.

123. Without data from BCBSF and United Healthcare, the Ingenix Databases could

not have been successfully marketed for UCR pricing. Similarly, BCBSF could not have saved the millions of dollars it did if it had not used the Ingenix Databases for making UCR determinations even though it knew that they were flawed and invalid.

124.   By using the Ingenix Databases for making its UCR determinations, misrepresenting them as providing a valid and unassailable basis for such decisions, and deterring its subscribers from challenging or otherwise raising questions over how it set UCR, BCBSF was able to benefit substantially from its role in assisting the control and direction of the Enterprise, along with Ingenix and United Health Care.

125.   Through its wrongful conduct as alleged herein, BCBSF, in violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of the Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

126.   BCBSF, acting through its officers, agents, employees and affiliates, has committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(5), prior to and during the RICO Class Period, and continues to commit such predicate acts, in furtherance of its underpayment scheme for Nonpar services, including (a) mail fraud, in violation of 18 U.S.C. § 1341, and (b) wire fraud, in violation of 18 U.S.C. § 1343. Such predicate acts include the following:

> (a) by mailing or causing to be mailed and otherwise knowingly agreeing to the mailing of various materials and information including, but not limited to, materially false and invalid Allowed Amount determinations and EOBs, for the purpose of saving BCBSF money at its Members' expense, with each such mailing constituting a separate and distinct violation of 18 U.S.C. § 1341; and
>
> (b) by transmitting or causing to be transmitted and otherwise knowingly agreeing to the transmittal of various materials and information including, but not limited to, materially false Allowed Amount determinations and related explanation of such determinations, by means of telephone, facsimile, and the Internet, in interstate commerce, for the purpose of effectuating the above-

described false payment schemes, and each such transmission constituting a separate and distinct violation of 18 U.S.C. § 1343.

127.    As set forth above, BCBSF instructed its claims personnel to make Nonpar Benefit Reductions which were contrary to law and its members' benefit plans. BCBSF knew that the data contributed to Ingenix was flawed and incomplete, but BCBSF continued to use the Ingenix Databases anyway.

128.    In furtherance of its underpayment scheme for Nonpar services, BCBSF, in violation of 18 U.S.C. §§ 1341 and 1343, repeatedly and regularly used the U.S. Mail and interstate wire facilities to further all aspects of the intentional underpayment to its member by delivering and/or receiving materials, including EOBs and other materials necessary to carry out the scheme to defraud Plaintiff and other Members.

129.    The foregoing communications via U.S. mail and interstate wire facilities contained false and fraudulent misrepresentations and/or omissions of material facts, had the design and effect of preventing a meaningful evaluation and review of the Enterprise's UCR determinations, and/or otherwise were incident to an essential part of BCBSF's scheme to defraud described in this Complaint.  Further, they were used to provide the under-payment scheme for Nonpar services with an appearance of legitimacy and regularity, and/or postpone ultimate discovery and complaint of the under-payment scheme for Nonpar services, thereby making their discovery less likely than if no such mailings or wire transmissions had taken place.

130.    The misrepresentations and omissions in these materials have included and include those set forth previously in this Complaint.

131.    As claims administrators of various of the BCBSF plans, BCBSF occupied, and occupies, a position of trust and it had, and has, a special relationship with its Plan Members that requires it to accurately represent the terms and conditions of the BCBSF plans, and to disclose

all facts the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

132.    BCBSF knew that its Plan Members and their providers would reasonably rely on the accuracy, completeness and integrity of disclosures by the Enterprise.  BCBSF Members and their providers did rely to their detriment on misrepresentations and omissions from the Enterprise.

133.    Each such use of the U.S. Mail and interstate wire facilities alleged in this Complaint constitutes a separate and distinct predicate act.

134.    The above-described acts of mail and wire fraud are related because they each involve common members, common Nonpar claim practices, common results impacting upon common victims, and are continuous because they occurred over several years, and constitutes the usual practice of BCBSF such that they amount to and pose a threat of continued racketeering activity.  BCBSF's scheme to defraud is open-ended and not inherently terminable.

135.    The direct and intended victims of the pattern of racketeering activity described previously herein are Nonpar providers and BCBSF enrollees and beneficiaries and their assignees and the members of the RICO Class, whom BCBSF has underpaid Nonpar services.

136.    Plaintiff and Members of the RICO Class were injured by reason of BCBSF's RICO violations because they directly and immediately were underpaid benefits. BCBSF further deprived them of the knowledge necessary to challenge its underpayments.  Their injuries were proximately caused by BCBSF's violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of BCBSF's RICO violations (and commission of underlying predicate acts) and, but for BCBSF's RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

137.    Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiff and the members of the RICO Class are entitled to recover threefold their damages, costs and attorneys' fees from BCBSF and other appropriate relief.

## COUNT II

## VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

138.    Plaintiff repeats the allegations contained in the prior paragraphs of the Complaint as if fully set forth herein.

139.    During the Class Period BCBSF and its Co-Conspiratorss have combined, conspired and or contracted to restrain interstate trade in violations of 15 U.S.C. § 1.

140.    The combination or conspiracy alleged in this Complaint consisted of a continuing agreement, understanding or concert of action by BCBSF and its Co-Conspiratorss, the substantial terms of which were to create, maintain and use the Ingenix Database to produce artificially low UCR rates for reimbursement of ONS

141.    The conspiracy was intended to directly affect the end pay of the medical services covered by out-of-network insurance plans. The intent, purpose, and effect of the conspiracy was to cause under-reimbursement for medical services, and thereby minimize reimbursement payments made on such claims among Defendant and their Co-Conspiratorss.

142.    Many health insurers, including BCBSF and its Co-Conspiratorss, offer lower premiums to consumers who agree to limit themselves to a preferred network of physicians.

143.    Network physicians, in turn, agree to provide services to those insured individuals ("members") at negotiated rates that are lower than those for patients outside of the given policy — i.e., lower than the physicians would ordinarily charge for the same service. The terms of the more expensive health insurance plans that permit members to seek treatment from physicians

who are out-of-network incentivize patients to visit in-network physicians by imposing higher out-of- pocket payments when members go out-of-network.

144.    For members who have contracted to retain the right to see out-of-network physicians, and agreed to pay the higher premium, health insurers generally reimburse these members for ONS at the lesser of either a percentage of: (a) the actual amount of their medical bills; or (b) the UCR rate of doctors in the same or similar geographic area for the substantially the same service.

145.    Unbeknownst to members, however, BCBSF and its Co-Conspiratorss have conspired to manipulate UCR rates used to determine reimbursement for ONS through Ingenix and the Ingenix Database. Ingenix is a conduit for rigged data supplied by insurance companies, including, upon information and belief, BCBSF. The primary design and effect of the conspiracy is to artificially restrain the reimbursement amounts for claims for ONS by Antitrust Class Members across the United States.  BCBSF and its Co-Conspiratorss have conspired to lower their and other healthcare insurers' costs of providing such insurance through anticompetitive means that result in the shifting of these costs to subscribers and providers.

146.    As the head of the New York Attorney General's task force that is investigating the conduct alleged herein commented, "[G]arbage in, garbage out." As described herein, Defendant and its theft Co-Conspiratorss combined to exert control over UCR rates used for reimbursing ONS by, upon information and belief, providing knowingly flawed data to Ingenix, which is then further manipulated or "scrubbed" by Ingenix. Further, Defendant and its Co-Conspiratorss agreed through various contract and licensing agreements to use the flawed data, thereby depriving insureds, including Class Members, of a competitive market where they could obtain reimbursement for ONS. Defendants' conspiratorial manipulations yield artificially low

UCR rates, resulting in artificially low ONS reimbursements to Nonpars and their BCBSF patients and higher out-of-pocket expenses for BCBSF Members.

147. The relationships between BCBSF, its Co-Conspiratorss, and Ingenix are rife with inherent conflicts of interests including against Class Members, which inhibit the construction of a rigorously defined and audited database necessary to determine fair and accurate UCR rates. Insurers, such as BCBSF, who have a contract with Ingenix, are incentivized to provide flawed claims data which will result in lower UCR rates in order to pay lower reimbursements for ONS. Furthermore, Ingenix offers insurance companies that provide data to Ingenix, including, upon information and belief, BCBSF, a discounted rate for use of the database, thereby creating further incentive to provide flawed data, and highlighting the collusive and unfair nature of this unlawful scheme.

148. Given the conspiracy to construct and use flawed data and employ inaccurate UCR rates, neither BCBSF, its Co-Conspiratorss, nor Ingenix, have any incentive to prevent or investigate the risk of biased, inaccurate data. In fact, Ingenix has an incentive to do the opposite because, by turning a blind eye to the quality and reliability of the data submitted to it, and then manipulating the data to support artificially low UCR rates, Ingenix can both support its parent company by assisting United Health to perpetuate low reimbursement rates for out-of-network claims (up to 10% of total claims submitted to United Health) and maintain its dominant market position as the data provider for its health insurance company clients/participants.

149. Defendants' conspiracy to fabricate, manipulate and disseminate flawed data is predicated on keeping the Ingenix Database and its inherent anticompetitive nature a secret from insureds, including Class Members. For instance, although new versions of the Ingenix Database are released semi-annually to create the impression that their values are current, each new semi-

annual release is filtered through and designed to include previously-manipulated data that is carried over from prior releases. Accordingly, each new release of the Ingenix Database always lags well behind the actual UCR rates, precisely as United Health, BCBSF and their Co-Conspiratorss intended. By calculating benefits based on the older Ingenix Database — instead of based upon actual and current UCR rates — the insurance companies that use the Ingenix Database were and are under-paying claims based on the Ingenix Database.

150.    As previously alleged, among the defects and manipulations in the Ingenix Database which facilitated the conspiracy and its anticompetitive effects are the following:

a.    Information about the providers' training and qualifications, the type of facility where the comparative medical service was provided, and the patient's condition is excluded from the database;

b.    Ingenix deliberately manipulates the database by deleting valid high doctors' bills and by deleting proportionally more high bills than low bills;

c.    Physicians' charges that have modifiers to indicate procedures or services with complications, which are typically higher, are deliberately excluded from the database;

d.    Ingenix declines to collect or include any information affecting the value of the medical service, e.g., whether the service was performed by someone other than a physician;

e.    Ingenix pools data from dissimilar providers, e.g., nurses and physician assistants, with data from physicians in order to skew UCR rates downward;

f.    The Ingenix Database contains outdated information;

g.    Ingenix does not audit data it receives from contributing entities to ensure the data is appropriate and accurate, e.g., negotiated or discounted rates are not included;

h.    Some entities contributing data delete higher charges from the data they submit to the Ingenix database. Ingenix accepts this data;

i.    Ingenix employs a defective methodology to formulate additional charges; and

      j.   Defendants not only provide data for use in the Ingenix Database, they legitimize the Ingenix Database by recycling the results provided by Ingenix for determining UCRs.

151.    Rather than disclose the defective nature of the Ingenix Database and its UCR rates, BCBSF and its Co-Conspiratorss led Class Members to believe that they were using a fair and accurate UCR rate to reimburse members for ONS, one that bore a direct and reasonable relationship to the UCR rates providers charged within a given geographic area for the same or similar services.

152.    The agreements by BCBSF and its coconspirators to promote and use the Ingenix Database to determine UCR rates for out-of-network reimbursements restrain trade and reduce competition by reducing UCR rates — and thus reimbursements for ONS — well below market levels to induce health insurance companies to use the Ingenix Database.

153.    Consumer complaints about low reimbursements for out-of-network medical services have elicited no meaningful explanation. Instead, BCBSF and its Co-Conspiratorss continued to conceal their provision and/or knowing use of the flawed Ingenix Database.

154.    Linda Lacewell, head of New York Attorney General Andrew M. Cuomo's Healthcare Industry Taskforce stated at a February 13, 2008 press conference: To date, we have found that health insurers consistently underpay consumers for their out-of-network medical expenses, and they do it through deception, manipulation of data and outright fraud. This is a picture of conflict of interest from top to bottom. . . Every single player on this chart [showing the interrelationship of Ingenix, United Health and other insurers] has an interest in keeping rates low. Nobody on this chart has an interest in keeping rates at a fair rate for consumers.

155.    The Attorney General of New York, Andrew Cuomo, stated that: "This involves fraud in the hundreds of millions of dollars, affecting thousands and thousands of families." Id.

156.    BCBSF and its Co-Conspiratorss have inflicted significant financial harm on their

enrollees and beneficiaries and their Nonpar providers. A significant percentage of claims submitted to Defendant and its Co-Conspiratorss are for ONS. Nonpar provider Class Members who provided ONS did not get full reimbursement on their reasonable and necessary medical charges. Plaintiff Williams and BCBSF enrollee Class Members paid for out-of-network coverage, obtained services from providers outside of the BCBSF network, and had the right to reimbursement under the terms of their policies, including a fair and accurate calculation. As a result of the conspiracy, Plaintiff and the members of the Class paid BCBSF higher premiums for out-of-network coverage and then received lower reimbursement for ONS than they would have received in a competitive market place.

157. BCBSF and its Co-Conspirators concealed their anticompetitive conduct from Plaintiff and the members of the Class (as set forth below) by conspiring to manipulate the process by which reimbursement rates were set. Defendant and its Co-Conspiratorss also prevented Plaintiff and the members of the Class from knowing or discovering the actual methodology used by Ingenix to determine the UCR rate. Moreover, the fraudulent conduct alleged herein was of such a nature as to be self-concealing

158. BCBSF's and its Co-Conspiratorss' efforts to conceal its source and methodology of determining UCR rates indicate that it knew that its conduct was fraudulent.

159. Thus, BCBSF and its Co-Conspiratorss participated in the Ingenix scheme by concealing that it knew the methodology used by Ingenix to calculate UCR rates was inherently flawed and/or, upon information and belief, it was providing flawed data to Ingenix. As a result, BCBSF and its Co-Conspiratorss knew that the UCR rates it used to set its Allowed Amounts were lower than the actual costs of medical services.

160. Through the conspiracy, BCBSF and its Co-Conspiratorss have in fact caused a

decrease in reimbursement or payments for out-of-network medical services which would have been paid but for their anticompetitive conduct.

161.    As the result of the wrongful conduct alleged herein, Nonpar Provider members of the Class did not obtain full reimbursement on their reasonable and necessary medical charges, and Plaintiff and the BCBSF enrollee members of the Class paid higher out-of-pocket payments for out-of-network medical services than they would have paid but for the unlawful anti-competitive conduct, have been injured in their business or property, and have suffered damages in an amount to be determined at trial.

162.    The conduct of BCBSF and its Co-Conspiratorss constitutes a violation of § 1 of the Sherman Act, 15 U.S.C. §1 under both a per se and rule of reason analysis. Plaintiff and the Antitrust Class are entitled to recover all damages and treble damages allowed under § 1 of the Sherman Act against BCBSF, jointly and severally, together with their costs of suit, including reasonable attorneys' fees, as well as any necessary injunctions to bar or abate BCBSFs' anti-competitive acts.

## COUNT III

## VIOLATION OF FL. STATS. §627.6044(1)

163.    Plaintiff repeats the allegations contained in the prior paragraphs of the Complaint as if fully set forth herein.

164.    Defendant's use of the flawed Ingenix data to make its "Allowed Amount," i.e., UCR, determinations violates Section 627.6044(1) of the Florida Statutes which provides:

> Each insurance policy that provides for payment of claims based on a specific methodology, including, but not limited to, usual and customary charges, reasonable and customary charges, or charges based upon the prevailing rate in the community, shall specify the formula or criteria used by the insurer in determining the amount to be paid.

F.S.A. §627.6044(1) (2009).

165.    Despite having every opportunity to disclose, in its benefit plans, the criterion BCBSF actually relied upon in making its Allowed Amount determinations – including the Ingenix UCR data – and to identify the substantive problems with that data as alleged hereinabove, BCBSF chose to omit the same altogether.

166.    As alleged earlier, rather than disclose the defective nature of the Ingenix Database and its UCR rates, BCBSF and its Co-Conspiratorss led Class Members to believe that they were using a fair and accurate UCR rate to reimburse members for ONS, one that bore a direct and reasonable relationship to the UCR rates providers charged within a given geographic area for the same or similar services. BCBSF's and its Co-Conspiratorss' efforts to conceal its source and methodology of determining Allowed Amounts indicate that it knew that its conduct was fraudulent.

167.    Thus, BCBSF and its Co-Conspiratorss participated in the Ingenix scheme by concealing that it knew the methodology used by Ingenix to calculate UCR rates was inherently flawed and/or, upon information and belief, it was providing flawed data to Ingenix. As a result, BCBSF and its Co-Conspiratorss knew that the UCR rates it used to set its reimbursement rates were lower than the actual costs of medical services.

168.    Through the conspiracy averred hereinabove, BCBSF and its Co-Conspiratorss have in fact caused a decrease in reimbursement or payments for out-of-network medical services which would have been paid but for their anticompetitive conduct.

169.    BCBSF and its Co-Conspiratorss have inflicted significant financial harm on their enrollees and beneficiaries and their Nonpar providers. Nonpar provider Class Members who provided ONS did not get full reimbursement on their reasonable and necessary medical charges. Plaintiff and BCBSF enrollee Class Members paid for out-of-network coverage, obtained

services from providers outside of the BCBSF network, and had the right to reimbursement under the terms of their policies, including not only a fair and accurate calculation but also proper disclosure of the methodology underlying Defendant's Allowed Amount determinations.

170.    As a result of Defendant's concealment of the actual source and methodology used for its "Allowed Amount," i.e., UCR, determinations, Plaintiff and the Class are in doubt as to their rights under F.S. §627.6044(1) and the benefit plans issued by BCBSF.

171.    Plaintiff and the Class have a genuine, actual, present, and practical need   for a declaration that Defendant's conduct, as described herein, is improper and in violation of the aforementioned statute.

**WHEREFORE**, Plaintiff demands judgment in his favor against Defendants as follows:

- Certifying the Class as set forth in this Complaint, and appointing named Plaintiff as Class representative for the Class;
- Declaring that BCBSF and the Ingenix-BCBSF Enterprise engaged in a scheme to reduce the amount of BCBSF's payments to its Members, in violation of 18 U.S.C. § 1962(c) and F.S.§627.6044(1); and awarding supplemental damages pursuant to such declaration;
- Preliminarily and permanently enjoining BCBSF from using the Ingenix
- Databases as well as Medicare fees to determine Allowed Amount, along with other Nonpar Benefit Reductions;
- Preliminarily and permanently enjoining BCBSF from discouraging Nonpar services or placing undisclosed obstacles in the path of BCBSF members seeking to access Nonpar care;
- Ordering BCBSF to recalculate and issue unpaid benefits to Plaintiff and Class members that were underpaid as a result of BCBSF's Nonpar Benefit Reductions;

- Awarding Plaintiff and the Members of the Class compensatory damages, trebled where required by law, and disbursements and expenses of this action, including reasonable counsel fees, in amounts to be determined by the Court and other appropriate relief;

- Awarding interest from the date of initial Nonpar Benefit Reductions for Plaintiff and Class Members for all unpaid amounts; and

- Granting such other and further relief as is just and proper.


DATED:      January 12, 2010          By:   s/ WILLIAM C. WRIGHT
                                            Florida Bar No. 0138861
                                            THEODORE J. LEOPOLD
                                            DIANA MARTIN
                                            LEOPOLD KUVIN, P.A.
                                            2925 PGA Boulevard, Suite 200
                                            Palm Beach Gardens, FL 33410
                                            Tel. (561) 515-1400
                                            Fax (561) 515-1401
                                            wwright@leopoldkuvin.com

                                            CHRISTOPHER M. BURKE
                                            SCOTT+SCOTT, LLP
                                            600 B. Street, Suite 1500
                                            San Diego, CA 92101
                                            Tel. (619) 233-4565
                                            Fax (619) 233-0508
                                            cburke@scott-scott.com

                                            JOSEPH P. GUGLIELMO
                                            SCOTT+SCOTT, LLP
                                            500 Fifth Avenue, 40th Floor
                                            New York, NY 10110
                                            Tel. (212) 223-6444
                                            Fax (212) 223-6334

                                            JEFFREY A. LEON
                                            FREED & WEISS LLC
                                            111 West Washington Street, Suite 1331
                                            Chicago, IL 60602
                                            Tel. (312) 220-0000
                                            Fax (312) 220-7777
                                            jeff@freedweiss.com

*Attorneys for Plaintiff*

48